IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BERNADETTE SMITH, | ) | CASE NO. 1:18-cv-01765 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Bernadette Smith ("Plaintiff" or "Smith") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Smith filed an application for DIB on May 18, 2015, alleging a disability onset date of May 5, 2015.  Tr. 83, 125, 133, 134, 147, 224-225, 258.  She alleged disability due to obstructive sleep apnea, asthma, arthralgia, myalgia, hyperglycemia, crying spells, depression, anxiety, and leg swelling.  Tr. 125, 134-135, 148, 154, 251.  After initial denial by the state agency (Tr. 148-150) and denial upon reconsideration (Tr. 154-156), Smith requested a hearing (Tr. 157-158).  A

1

hearing was held before an Administrative Law Judge ("ALJ") on September 11, 2017.  Tr. 98-124.

In his February 6, 2018, decision (Tr. 80-97), the ALJ determined that Smith had not been under a disability from May 5, 2015, through the date of the decision (Tr. 84, 92).  Smith requested review of the ALJ's decision by the Appeals Council.  Tr. 220-223.  On June 22, 2018, the Appeals Council denied Smith's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Smith was born in 1967.  Tr. 224.  Smith was not married.  Tr. 531.  She has an adult daughter.  Tr. 531.  Smith was living with her mother at the time of the hearing and had been living with her since Smith lost her job in August 2014.  Tr. 101, 103, 251.  Smith graduated from high school and worked as a night clerk, receptionist at a homeless shelter for almost 30 years.  Tr. 101, 103-104, 108-111, 252-253, Doc. 12, p. 2.  At her job, she did a lot of different tasks, including some maintenance and she also supervised other employees.  Tr. 104, 108-111. In 2014, Smith was terminated from her position for being tardy a couple of times.  Tr. 110, 251.

### B.    Medical evidence

#### 1.    Treatment history

On February 4, 2015, Smith was seen at the South Pointe Hospital emergency room for complaints of shortness of breath and productive cough with clear sputum for the prior four weeks; mid-sternal chest pain with coughing; and bilateral pedal edema for a few months.  Tr. 438.  Smith indicated that she had a history of asthma but had not had asthma medicine for over a year.  Tr. 438.  The emergency room diagnoses were dyspnea and lower extremity edema.  Tr.

439.  The exam revealed 2+ lower extremity edema.  Tr. 439.  Breathing treatments were not administered because the lung exam was negative for wheezing and diminished lung sounds.  Tr. 439.  A CT of the chest was negative for pulmonary embolism.  Tr. 439.  A chest x-ray showed no acute pulmonary process and an ultrasound of the lower extremities showed no evidence of deep vein thrombosis.  Tr. 440.  Smith was provided prescriptions for Lasix and Albuterol.  Tr. 439.  Smith was discharged in stable condition.  Tr. 440.

Following her emergency room visit, on May 5, 2015, Smith saw Geeta Gupta, M.D., in internal medicine for her shortness of breath and joint pain.  Tr. 436-438.  A review of systems was positive for shortness of breath, wheezing, myalgias and joint pain but negative for chest pain, leg swelling, back pain and falls.  Tr. 436.  Physical examination findings were unremarkable.  Tr. 437.  Dr. Gupta assessed obstructive sleep apnea; mild intermittent asthma, stable; arthralgia; myalgia; hyperglycemia; and obesity.  Tr. 437.  Dr. Gupta ordered additional testing and provided Smith with a consult for nutrition therapy.  Tr. 437.

On May 14, 2015, Smith had pulmonary function testing performed.  Tr. 443.  The testing was "consistent with a mild obstructive ventilatory defect."  Tr. 443.  A sleep study was performed on May 29, 2015.  Tr. 441-442.  The impression was moderate obstructive sleep apnea syndrome exacerbated to severe during REM sleep.  Tr. 442.  It was recommended that Smith undergo a CPAP titration study with a dose of Ambien to help facilitate sleep and discuss weight reduction.  Tr. 442.

On June 26, 2015, Smith saw Dr. Gupta for a follow up after having been treated at the emergency room for pain in her right hip and right knee that she had been having for several weeks and that worsened after Smith started moving boxes and going up and down stairs as she was in the process of moving.  Tr. 471.  While at the emergency room, Smith was treated with

pain medications and given a brace and cane.  Tr. 471.  Her pain had improved slightly.  Tr. 471.

She was scheduled for an orthopedic follow up.  Tr. 471.  Dr. Gupta noted that Smith had a

CPAP titration study performed; the results were pending.  Tr. 471.  Smith's musculoskeletal

examination showed normal range of motion and no edema or tenderness and there was no

redness, tenderness, or swelling in Smith's right knee.  Tr. 472.  Smith's gait was normal.  Tr.

472.  Dr. Gupta's diagnoses were osteoarthritis, obesity, and obstructive sleep apnea.  Tr. 472.

On July 13, 2015, Smith saw Michael Kolosky, D.O., a resident physician, and Robert J.

Hampton, D.O., in the Department of Orthopaedics at South Pointe for her complaints of

bilateral knee pain and right hip pain.  Tr. 518-521.  An x-ray of the bilateral knees taken on July

13, 2015, showed moderate predominantly compartment narrowing bilaterally; associated tiny

tricompartmental osteophytes; and no acute fracture or dislocation seen.  Tr. 523, 527.

Diagnoses were bilateral knee degenerative joint disease, right hip degenerative joint disease,

and obesity.  Tr. 521.  Dr. Kolosky discussed with Smith the etiology and natural progression of

osteoarthritis and recommended that Smith see a nutritionist for her obesity, noting that "the

majority of her pain is likely contributed to by being overweight and the increased stresses across

her joints."  Tr. 521.  Smith was provided with a prescription for Relafen 750 mg twice a day and

a prescription for aquatic and land physical therapy.  Tr. 521.  Smith declined a cortisone

injection.  Tr. 521.

Smith saw Dr. Gupta the next day, July 14, 2015, for follow up regarding her obstructive

sleep apnea and weight problems.  Tr. 467-468.  Physical examination findings were normal.  Tr.

467.  Dr. Gupta's assessment/plan was obstructive sleep apnea – CPAP ordered; asthma, mild

intermittent, uncomplicated – continue current medications and avoid triggers; generalized

osteoarthritis – stable; and obesity – weight loss, diet and exercise.  Tr. 468.

4

Smith attended physical therapy sessions from August 2015 through October 2015.  Tr. 491-499, 503-504, 506-515.  At her last session on October 22, 2015, the physical therapist observed that Smith was overweight and ambulated into the gym with no obvious gait deviation at a normal pace – she was carrying her standard cane.  Tr. 492.  When Smith was discharged from physical therapy on October 22, 2015, it was noted that that Smith had improved tolerance for exercises; increased independence with home exercise plan; and decreased intensity of pain.  Tr. 492.

Smith saw Dr. Gupta on December 29, 2015.  Tr. 543-544.  Smith was doing well and her asthma was controlled.  Tr. 544.  Smith had pain due to osteoarthritis and was being seen by orthopedics.  Tr. 544.  Smith was using her CPAP machine and trying to lose weight.  Tr. 544.  On physical examination, Smith had a normal range of motion; there was no edema and she had a normal gait.  Tr. 544.

Smith saw Dr. Gupta on January 7, 2016, for her right knee pain and spasm in her left arm.  Tr. 540-541.  Smith complained of neck pain and tingling in her left hand.  Tr. 541.  Dr. Gupta assessed that the muscle spasm was likely radicular and she ordered a cervical x-ray.  Tr. 541.

Smith saw Dr. Gupta for follow up on February 4, 2016.  Tr. 537-538.  Smith complained of numbness and tingling in her feet and in her left hand.  Tr. 537.  Dr. Gupta noted that Smith's x-rays showed cervical spondylosis.  Tr. 537.  Smith reported that she had no more neck pain and no bowel or bladder dysfunction.  Tr. 537.  Physical examination revealed normal range of motion, normal reflexes, normal muscle tone, normal gait and normal coordination.  Tr. 538-539.  Dr. Gupta's assessment/plan was (1) osteoarthritis of spine with radiculopathy, cervical region – has normal neurological exam - consult to neurology; (2) morbid obesity due to excess calories –

5

weight loss, diet and exercise; (3) mild intermittent asthma without complication – mild intermittent asthma stable – avoidance of triggers recommended; (4) obstructive sleep apnea – on CPAP; and numbness and tingling – may need MRI and EMG – consult to neurology.  Tr. 538.

On May 3, 2016, Smith saw neurologist Dr. Robert F. Richardson, Jr., M.D., regarding Smith's tingling paresthesias in her hands and feet as well as in her face that Smith indicated she had been experiencing for about a year.  Tr. 551-552.  Smith's paresthesias was not constant but occurred daily and lasted seconds to minutes.  Tr. 551.  Smith also reported occasional lightheadedness and a six-month history of cramping/jerking of the muscles in her left proximal arm.  Tr. 551.  Dr. Richardson's motor examination showed normal power, tone, and bulk and her extremities were without edema.  Tr. 552.  A sensory examination showed reduced pinprick sensation on the entire left hemibody other than the face and normal joint position sensation throughout.  Tr. 552.  A coordination examination showed normal finger to nose and heel to shin testing.  Tr. 552.  Smith's muscle strength reflexes were normal and symmetric throughout and her gait and station were normal.  Tr. 552.  Dr. Richardson's impression was "Diffuse tingling paresthesias.  Exam evidence for left hemisensory deficit.  Possibilities are intracranial pathology such as demyelinating disease, stroke, or tumor.  I cannot rule out conversion disorder, however."  Tr. 552.  In order to further evaluate Smith's condition, Dr. Richardson ordered a cranial MRI.  Tr. 552, 588-590.

Smith saw Dr. Richardson for a follow up on July 12, 2016.  Tr. 556.  A physical examination continued to show reduced pinprick sensation on the entire left hemibody other than the face.  Tr. 556.  Otherwise, the physical examination findings were normal.  Tr. 556.  Dr. Richardson indicated that the cranial MRI showed no significant pathology.  Tr. 556.  Dr. Richardson's impression was "Diffuse tingling paresthesias without structural findings to

6

explain.  The presentation is not consistent with peripheral neuropathy.  I cannot rule out conversion disorder given the lack of objective findings."  Tr. 556.  Dr. Richardson offered Smith nortriptyline to treat the tingling and to potentially address any mood disorder.  Tr. 556. Smith declined the medication.  Tr. 556.  Dr. Richardson indicated that Richardson should follow up with him in three months.  Tr. 556.

On July 21, 2016, Smith saw Dr. Gupta for a physical.  Tr. 561-564.  Smith reported joint and neck pain and tingling and sensory change.  Tr. 562-563.  Physical examination findings, however, were normal.  Tr. 563.

Smith saw Dr. Richardson on October 10, 2016, for follow up.  Tr. 557.  Dr. Richardson's impression again was "Diffuse tingling paresthesias without structural findings to explain.  The presentation is not consistent with peripheral neuropathy.  I cannot rule out conversion disorder given a lack of objective findings."  Tr. 557.  Dr. Richardson discussed medication again with Smith but she indicated she was comfortable with her current status.  Tr. 557.

Smith saw Dr. Gupta on October 20, 2016.  Tr. 567-568.  Progress notes reflect that Smith was doing well; she was using her CPAP machine; her asthma had been stable; she was not losing weight and had not seen a nutritionist.  Tr. 567.  Dr. Gupta ordered a consult for a weight management program.  Tr. 568.

On March 15, 2017, Smith was treated at the emergency room for complaints of a fever, chills, cough, myalgia and headache.  Tr. 594-598, 628-633.  Smith denied worsening of her asthma, back pain, chest pain, leg pain, leg swelling, or difficulty ambulating.  Tr. 597, 632, 633. On physical examination, Smith exhibited normal range of motion.  Tr. 598.  Smith was discharged in stable condition with diagnoses of influenzal acute upper respiratory infection,

7

myalgia, arthralgia (unspecified joint), fever (unspecified cause), and hypokalemia.  Tr. 598.

Smith was instructed to take potassium for seven days and Naprosyn as needed and to follow up

with her primary care physician.  Tr. 598.

Smith saw Dr. Gupta for follow up on March 28, 2017.  Tr. 601-602.  Smith reported

feeling much better following her emergency room visit for influenza.  Tr. 601.  Smith reported

joint pain.  Tr. 601.  On physical examination, Smith exhibited normal range of motion, no

edema, and a normal gait.  Tr. 601.  Dr. Gupta noted that Smith had seen weight management.

Tr. 601.  Dr. Gupta assessed chronic pain of both knees, noting that Smith declined surgery and

steroid injections.  Tr. 602.

### 2.  Opinion evidence

#### a.  Treating physician

On July 25, 2017, treating physician Dr. Gupta completed a Medical Source Statement.

Tr. 662-665.  Dr. Gupta noted that her medical specialty was internal medicine and she had

treated Smith since May 5, 2015.  Tr. 663.  Dr. Gupta indicated that Smith's diagnoses were (1)

osteoarthritis with hip and knee pain; (2) cervical radiculopathy; (3) asthma – stable; (4)

obstructive sleep apnea (on CPAP); (5) obesity; and (6) pre-diabetes.  Tr. 663.  Dr. Gupta

indicated that emotional factors did not contribute to the severity of Smith's symptoms or

functional limitations.  Tr. 663.  Smith's symptoms included pain in the knees, hips and multiple

joints.  Tr. 663.  When asked to identify any clinical findings, laboratory findings and diagnostic

test results supporting Smith's diagnoses, Dr. Gupta listed a January 7, 2016, cervical spine x-ray

(degenerative joint disease); a July 23, 2015, knee x-ray (osteoarthritis); and a July 13, 2015,

orthopedic evaluation of the bilateral knees and right hip (degenerative joint disease).  Tr. 663.

Dr. Gupta indicated that Smith's medications included an inhaler, albuterol, and a CPAP machine.  Tr. 663.  There were no side effects noted.  Tr. 663.

Dr. Gupta opined that functionally Smith was limited to lifting and carrying 10 pounds occasionally; handling, grasping, and fingering occasionally; standing for 3 hours total in an 8-hour workday; walking for 3 hours total in an 8-hour workday; and sitting for 3 hours total in an 8-hour workday.[1]  Tr. 664.  Dr. Gupta opined that Smith would need to take unscheduled breaks during a workday as needed, every 2 hours, and Smith would have to rest for 15 minutes before returning to work.  Tr. 664.  Dr. Gupta opined that Smith's symptoms would likely be severe enough to interfere with the attention and concentration needed to perform even simple work tasks for more than 25% of an 8-hour workday.  Tr. 664.  Dr. Gupta indicated that Smith would be absent from work on an as-needed basis due to flare ups.  Tr. 665.  If Smith were placed in a competitive work situation, Dr. Gupta opined that Smith would have difficulty ambulating, noting that she uses a cane, and her pain could cause limitations.  Tr. 665.  Dr. Gupta opined that the limitations noted in her opinion initially manifested themselves in 2015 when Smith established care with Dr. Gupta.  Tr. 665.

### b.    Consultative examiner

On December 23, 2015, consultative examining psychologist J. Joseph Konieczny, Ph.D., conducted a psychological evaluation.  Tr. 531-535.  Smith was one-half hour late to her appointment.  Tr. 531.  She was driven to the appointment by a friend.  Tr. 531.  Dr. Konieczny noted that Smith was subdued but pleasant and cooperative and she responded to all questions and tasks presented to her.  Tr. 531, 532.  When Dr. Konieczny inquired about Smith's disability,

---

[1] Dr. Gupta also indicated that Smith could stand, walk and sit for the noted 3-hour periods at one time without interruption.  Tr. 664.

Smith replied "I have arthritis in my legs and back." Tr. 531. In 2005, Smith was involved briefly in outpatient treatment to address depression following a miscarriage. Tr. 532. She relayed that she had been having some recent feelings of depression and a history of depression since 2010. Tr. 532. Smith indicated that her depression had worsened over the prior year because of her medical issues and inability to work. Tr. 532. Smith reported occasional episodes of crying but denied any suicidal thoughts. Tr. 532. She did not exhibit nervousness or anxiety and denied experiencing any such feelings on a regular basis. Tr. 532. Smith was not delusional or paranoid and denied experiencing hallucinations. Tr. 532. Smith showed no signs of impulsivity but she reported having difficulties controlling her temper and episodes of mood swings. Tr. 532.

Dr. Konieczny observed Smith's movements and walking to be somewhat slow and labored. Tr. 532. Smith was using a cane to assist her with walking. Tr. 532. Smith noted having pain in her knees, feet and back. Tr. 532.

Dr. Konieczny's diagnostic impression was other specified depressive disorder, depressive episodes with insufficient symptoms. Tr. 533, 534. Dr. Konieczny offered the following opinions regarding Smith's functional abilities:

> ABILITY TO UNDERSTAND, REMEMBER, AND CARRY OUT
> INSTRUCTIONS
> Bernadette shows no significant limitations in these areas.
>
> ATTENTION AND CONCENTRATION AND PERSISTENCE IN SINGLE
> AND MULTI-STEP TASKS
> Bernadette shows no significant limitations in these areas.
>
> RESPONDING APPROPRIATELY TO SUPERVISION AND CO-WORKERS
> IN THE WORK SETTING
> As a result of her depressive symptoms, Bernadette would have some diminished
> tolerance for frustration and diminished coping skills which would impact her
> ability to respond to severe supervision and interpersonal situations in the work

10

setting. She would, however, seem capable of responding appropriately to normal such situations.

<u>ABILITY TO RESPOND TO PRESSURE IN THE WORK SETTING</u>
Again, as a result of her depressive symptoms, Bernadette would have some diminished tolerance for frustration and diminished coping skills which would impact her ability to respond to severe supervision and interpersonal situations in the work setting. Again, she would seem capable of responding appropriately to normal such situations.

Tr. 533.

Additionally, Dr. Konieczny indicated that Smith was residing with her mother and daughter and Smith participated in routine daily household responsibilities to the extent she perceived she was physically able to. Tr. 534. Dr. Konieczny opined that Smith appeared capable of managing her own daily activities and handling her financial affairs without assistance. Tr. 534. Dr. Konieczny opined Smith's "overall level of functioning is at a reduced level of efficiency and reflective of her depressive symptoms, but primarily due to her perceived physical limitations." Tr. 534.

### c.     State agency reviewers

<u>*Physical*</u>

On August 31, 2015, state agency reviewing physician Stephen Sutherland, M.D., completed a physical RFC assessment. Tr. 129-130. Dr. Sutherland opined that Smith had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull unlimitedly, other than as shown for lift and/or carry; occasionally climb ladders/ropes/scaffolds; frequently climb ramps/stairs; and must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and unprotected heights. Tr. 129-130. Dr. Sutherland explained his RFC assessment

11

further, noting that Smith had a BMI of 48; bilateral moderate degenerative joint disease of the knees; and asthma that was controlled.  Tr. 129-130.

Upon reconsideration, on December 28, 2015, state agency reviewing physician Teresita Cruz, M.D., completed a physical RFC assessment.  Tr. 141-143.  Dr. Cruz's physical RFC assessment was similar to Dr. Sutherland's RFC assessment except Dr. Cruz found greater postural limitations than Dr. Sutherland did.  Tr. 141-142.  Dr. Cruz opined that Smith could never climb ladders/ropes/scaffolds; frequently climb ramps/stairs; frequently kneel; occasionally crouch; and occasionally crawl.  Tr. 141-142.  Dr. Cruz indicated that the postural limitations were due to Smith's morbid obesity and degenerative joint disease of the knees.  Tr. 142.

*Mental*

Upon reconsideration, on January 11, 2016, state agency reviewing psychologist David Dietz, Ph.D., completed a psychiatric review technique ("PRT") (139-140) and mental RFC assessment[2] (Tr. 143-144).  In the PRT, Dr. Dietz found that Smith's mental impairments caused mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and there were no repeated episodes of decompensation, each of an extended duration.  Tr. 139-140.

In the mental RFC assessment, Dr. Dietz opined that Smith had no understanding and memory limitations and no adaptation limitations.  Tr. 143, 144.  Dr. Dietz opined that Smith had sustained concentration and persistence limitations.  Tr. 143.  More particularly, Dr. Dietz opined that Smith was moderately limited in her ability to complete a normal workday and workweek

---

[2] At the time of the initial review, there were only physical impairments under review.  Tr. 128.  Thus, on initial review, a PRT and mental RFC assessment were not completed by a state agency reviewer.

without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 143.  Dr. Dietz explained his opinion further, stating Smith "retains the ability to complete a variety of complex tasks in a stable environment where production standards and schedules are more flexible."  Tr. 143-144.

Dr. Dietz opined that Smith had social interaction limitations.  Tr. 144.  More particularly, Dr. Dietz opined that Smith was moderately limited in her ability to interact appropriately with the general public and in her ability to accept instructions and respond appropriately to criticism from supervisors.  Tr. 144.  Dr. Dietz explained his opinion further, stating Smith "is capable of engaging in and maintaining superficial social interactions and relationships."  Tr. 144.

## C.     Hearing testimony

### 1.     Plaintiff's testimony

Smith testified and was represented at the hearing.  Tr. 101-102, 103-119.  Smith discussed her termination after 30 years of employment.  Tr. 104-105.  She explained that the stated reason for her termination was tardiness.  Tr. 104-105, 110-111.  Due to her medical conditions, Smith was having a hard time getting ready for work.  Tr. 105.  It was hard for her to get in and out of the bathtub and go up and down stairs.  Tr. 105.  She provided doctor notes to explain why she was tardy and she thought it was strange that she was fired after being tardy a couple of times.  Tr. 105, 110.  She thought that the actual reason for her termination was that there was a change in administration and Smith did not think that the individual in charge liked her or other individuals who had been with the old administration.  Tr. 110-111.  Smith looked for other work after being terminated but she has constant pain and other issues, including stomach issues and incontinence.  Tr. 106, 119.  When asked if Smith thought she could return to

her prior job if she was offered a position, Smith indicated she did not think she would be able to return because of the mental stress, the lifting requirements and the amount of time she would have to be on her feet.  Tr. 108-109.

Smith uses a cane because she has a tendency to fall.  Tr. 107.  Her knees give out on her. Tr. 107.  She fell three times that year in her bathtub at home.  Tr. 107.  Smith is unable to stand for long periods of time because she has problems with her back.  Tr. 110.  Smith estimated being able to be on her feet for one time for about an hour and for about an hour or two in total during the course of an 8-hour day.  Tr. 114-115.  She is also unable to sit for too long because her hip locks up on her.  Tr. 110.   She estimated being able to sit for about an hour and then she has to get up.  Tr. 115.  Once she gets up, Smith has to walk around for about 15 minutes.  Tr. 114.

Smith has pain all over – in her ankles, back, knees, and neck.  Tr. 113.  Smith's worst pain is in her knees.  Tr. 113.  Smith has swelling in her knees which causes her knee pain to escalate.  Tr. 113.  Her knees also crack and pop.  Tr. 113.  Walking too much causes swelling in Smith's knees.  Tr. 113.  Smith tries to stay mobile to avoid getting stiff.  Tr. 113.  She used to try to walk to the library which is at least five blocks from her home.  Tr. 113.  She could not make the walk without stopping to take a break after about 30 minutes of walking.  Tr. 113-114. Smith stopped walking to the library about a year prior to the hearing and only walks about a block to her uncle's house.  Tr. 114.  Even with walking the one block, Smith needs to use her cane and has problems with swelling.  Tr. 114.  The only time Smith really does not use her cane is when she is in her house.  Tr. 114.

Smith also has problems with her left upper extremity.  Tr. 115.  Smith is left-handed. Tr. 115.  She has swelling in her left wrist and spasms in her arm.  Tr. 115.  Smith's spasms

14

occur every day, throughout the day.  Tr. 115.  Smith's spasms have interfered with her ability to use her hand.  Tr. 115-116.  For example, sometimes when she has a spasm, she has dropped things.  Tr. 116.

Smith has asthma.  Tr. 116.  Smith had not had an asthma attack in awhile but she uses an inhaler and also a rescue inhaler every day.  Tr. 116.  Walking, going up and down stairs, humidity and pollen are all things that cause Smith to become short of breath.  Tr. 116.  Smith has been diagnosed with obstructive sleep apnea.  Tr. 116.  She uses a CPAP machine, which helps.  Tr. 116.  However, Smith does not drive long distances unless she has someone with her because she will fall asleep.  Tr. 116-117.  Smith considers a three-hour car ride a long distance. Tr. 117.

While at home during the day, Smith lies down or sits on the couch or in a chair with her right leg propped up to her heart.  Tr. 117, 119.  If Smith does not prop her leg up, her leg will start hurting and it will hurt, crack and pop, and swell.  Tr. 117-118.  To relieve her pain, Smith also takes over-the-counter medication, which helps.  Tr. 118.  The prescription medication that Smith's doctors have prescribed contain warnings regarding severe side effects and therefore Smith has been afraid to take the medication.  Tr. 118-119.

Smith indicated she was 5 feet, 3 inches and weighed 253 pounds.  Tr. 111.  At the time of the hearing, Smith weighed 30 pounds more than she had when she lost her job.[3]  Tr. 111. Smith felt she had gained so much weight because she was depressed when she lost her job.  Tr. 111.  She was unable to continue to pay to send her daughter to the private college she was attending, she lost her car, and she lost her home.  Tr. 111-113.  Smith continues to suffer from

[3] Smith had gained 50 pounds but then lost 20 pounds.  Tr. 111.

15

depression.  Tr. 112.  She has crying spells or becomes really angry.  Tr. 112.  She has crying spells once or twice each week, with a crying spell lasting for at least two days.  Tr. 112.  Smith was not seeing anyone for her depression.  Tr. 113.  She indicated she had not had a chance to talk with her doctors to get a referral.  Tr. 113.

Smith sees Dr. Gupta every three months.  Tr. 107.  Also, on Dr. Gupta's referral, Smith saw an orthopedic doctor and she also sees a gynecologist.  Tr. 107.  Upon Dr. Gupta's referral, Smith has tried physical therapy.  Tr. 107.  Dr. Gupta has indicated that Smith may need to have surgery on her knees.  Tr. 107.  Per her doctor's recommendation, Smith saw a nutritionist.  Tr. 108.  Smith has tried to adhere to the nutritionist's recommendations.  Tr. 108.  Smith has had issues with incontinence for about five years.  Tr. 108.

### 2.  Vocational expert's testimony

Vocational expert ("VE") Mark A. Anderson testified at the hearing.  Tr. 120-123, 282. The VE described Smith's past work, indicating it was a composite job – front desk clerk and night cleaner.  Tr. 120.  The VE indicated that the front desk clerk position was a light, semi-skilled job and the night cleaner position was a medium, semi-skilled job.  Tr. 120.

For his first hypothetical, the ALJ asked the VE to consider a hypothetical person Smith's age and with her education and work experience who is limited to light work and no climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; frequent kneeling; occasional crouching and crawling; avoidance of concentrated exposure to extreme temperatures and humidity as well as pulmonary irritants and unprotected heights; and capable of engaging in and maintaining superficial social interactions and relationships with the general public and coworkers.  Tr. 120-121.  The VE indicated that the described individual would not be able to perform Smith's past work.  Tr. 121.  However, there would be other jobs in the national

16

economy that the described individual could perform, including the following light, unskilled jobs: (1) electronics worker; (2) inspector and packager; and (3) assembler of electrical accessories.  Tr. 121.  The VE provided national job incidence data for the identified jobs.  Tr. 121.

For his second hypothetical, the ALJ asked the VE to consider an individual who is unable to sit, stand, and walk for a total of 8 hours in a normal workday without taking frequent, unscheduled breaks; is able to lift no more than 10 pounds occasionally; and has the same environmental and postural limitations as stated in the first hypothetical.  Tr. 121.  The VE indicated that the described individual would be unable to perform any jobs in the national economy.  Tr. 121-122.

Smith's counsel asked the VE to consider the ALJ's first hypothetical and add in that the individual would be off task at least 20 percent of the time.  Tr. 122.  The VE indicated that his earlier answers would change because 20 percent is beyond acceptable for unskilled work.  Tr. 122.  Smith's counsel then asked the VE to consider the ALJ's first hypothetical and add in that the individual would need to work in a stable environment where production standards and schedules are more flexible.  Tr. 122.  The VE indicated he was not certain what a flexible schedule was but noted that flexibility "comes more when you get into the semiskilled and skilled work so . . . that would preclude unskilled work."  Tr. 122-123.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his February 6, 2018, decision, the ALJ made the following findings:[5]

1.     Smith meets the insured status requirements through December 31, 2019. Tr. 85.

2.     Smith has not engaged in substantial gainful activity since May 5, 2015, the alleged onset date.  Tr. 85.

3.     Smith has the following severe impairments: diffuse tingling paresthesias osteoarthritis of the spine; morbid obesity; sleep apnea; and depression. Tr. 86.  Smith's mild intermittent asthma and prediabetes were non-severe impairments.  Tr. 86.

4.     Smith does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 86-87.

5.     Smith has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; frequent kneeling; occasionally crouching and crawling; avoid concentrated exposure to extreme temperatures and humidity as well as pulmonary irritants and unprotected heights; is capable of superficial interactions and relationships with the general public and coworkers.  Tr. 87-91.

6.     Smith is unable to perform past relevant work.  Tr. 91.

7.     Smith was born in 1967 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 91. Smith subsequently changed age category to closely approaching advanced age.  Tr. 91.

---

[5] The ALJ's findings are summarized.

8.    Smith has at least a high school education and is able to communicate in English.  Tr. 91

9.    Transferability of jobs skills is not material to the determination of disability.  Tr. 91.

10.   Considering Smith's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Smith can perform, including electronics worker, inspector/hand packager, and assembler of electrical accessories.  Tr. 91-92.

Based on the foregoing, the ALJ determined that Smith had not been under a disability, as defined in the Social Security Act, from May 5, 2015, through the date of the decision.  Tr. 92.

## V. Plaintiff's Arguments

Smith's two arguments relate to the ALJ's evaluation of medical opinion evidence.   Doc. 12, pp. 10-13.  First, Smith argues that the ALJ did not comply with the treating physician rule when weighing the opinion of Smith's treating physician Dr. Gupta.  Doc. 12, pp. 11-12. Second, she argues that the ALJ erred by assigning great weight to the opinion of the state agency reviewing psychologist Dr. Dietz but not including in the RFC Dr. Dietz's opinion that Smith "retains the ability to complete a variety of complex tasks in a stable environment where production standards and schedules are more flexible." Doc. 12, pp. 12-13 (quoting Tr. 90).

## VI.    Law & Analysis

**A.    Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

20

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     The Court should find no error with the ALJ's weighing of the medical opinion evidence**

Smith argues that the ALJ erred in weighing the medical opinions rendered by her treating physician Dr. Gupta and a state agency reviewing psychologist Dr. Dietz.  Doc. 12, pp. 10-13.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*,

21

378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

Where a physician does not have an ongoing treatment relationship with a claimant, his opinions are not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490-491 (6th Cir. 2005).

<u>Dr. Gupta</u>

The ALJ explained the weight he assigned to Dr. Gupta's opinion, stating:

Little weight is given to Dr. Geeta Gupta's opinion.  She completed a checklist-type medical source statement, where she opined that the claimant would essentially be able to lift, carry, handle, grasp, and finger occasionally during the workday, and be off task more than 25% of the day (see 14F).  This is inconsistent with the record as a whole.  Dr. Gupta does not support her analysis with any objective findings or rationale related to objective findings.  As summarized above,

22

the record itself supports a finding of less than light, without such extreme mental limitations.  For these reasons, the opinion is given little weight.
Tr. 91.

Smith challenges the ALJ's weighing of Dr. Gupta's opinion, arguing that the ALJ failed to identify the evidence that supported his finding that Dr. Gupta's opinion was inconsistent with the record as a whole.  Doc. 12, p. 12.  Smith is mistaken.  The ALJ made clear that he was referring to the evidence he had summarized above, which included treatment records reflecting normal examination findings as found by Dr. Gupta as well as other treatment providers.  Tr. 89, Tr. 467 (Dr. Gupta July 14, 2015, treatment notes, reflecting normal range of motion, no edema, and normal gait); Tr. 537-538 (Dr. Gupta February 4, 2016, treatment notes, reflecting reports of numbness and tingling but normal range of motion, normal reflexes, normal muscle tone, and normal gait); Tr. 551-552 (Dr. Richardson's May 3, 2016, treatment notes, reflecting reduced pinprick sensation on the left hemibody other than the face but normal motor and coordination examinations, normal gait and station, and normal and symmetric reflexes); Tr. 556 (Dr. Richardson's July 12, 2016, treatment notes, indicating no structural findings to explain Smith's diffuse tingling paresthesias); Tr. 562-563 (Dr. Gupta's July 21, 2016, treatment notes, indicating reports of joint and neck pain but no back pain and normal range of motion (neck and musculoskeletal), no edema or tenderness, normal muscle tone, normal gait and normal coordination); Tr. 595-598 (March 15, 2017, emergency room treatment notes, reflecting no back pain or difficulty ambulating and normal range of motion).   Considering the evidence cited by and referred to by the ALJ, Smith has not shown that the ALJ's finding that Dr. Gupta's more restrictive limitations were inconsistent with the record as a whole is unsupported by substantial evidence.

23

Smith also argues that the ALJ inaccurately stated that Dr. Gupta did not support her analysis with objective findings or rationale related to the objective findings, noting that Dr. Gupta's opinion refers to results of x-rays and an orthopedic evaluation. Doc. 12, p. 12. While it is correct that Dr. Gupta referenced a cervical spine x-ray, knee x-ray and bilateral and right hip orthopedic evaluation in her medical source statement, those items were listed in response to the question asking Dr. Gupta to list the clinical findings, laboratory findings, and diagnostic tests results that supported Smith's diagnoses. Tr. 663. While those tests may provide support the diagnoses listed in the medical source statement, Dr. Gupta did not explain how those tests support the restrictive functional limitations contained in the check-box section of the opinion. Tr. 664. Nor did Dr. Gupta provide an explanation for concluding that Smith would be unable to maintain the necessary attention and concentration for even simple work tasks for more than 25% of the time.[6]

Smith also challenges the ALJ's weighing of Dr. Gupta's opinion on the basis that the ALJ did not state that he applied the factors set forth in the Regulations for evaluating medical opinions. Doc. 12, p. 12. As indicated above, an ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *Francis*, 414 Fed. Appx. at 804. Here, the ALJ considered the record as a whole and explained the weight assigned to Dr. Gupta's opinion and provided reasons for that weight. Smith has not shown that the ALJ failed to satisfy the treating physician rule when weighing Dr. Gupta's opinion. It is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of

---

[6] Additionally, such a limitation is inconsistent with the opinion of Dr. Konieczny, the consultative examining psychologist, whose opinion the ALJ assigned great weight to. Tr. 90. In that opinion, Dr. Konieczny opined that Smith would have no significant limitations in the area of maintaining attention, concentration, and persistence in single and multi-step tasks. Tr. 90, 533.

credibility." *Garner*, 745 F.2d at 387.  The ALJ thoroughly reviewed and discussed the evidence and Smith has not shown that the ALJ's reasons for assigning little weight to Dr. Gupta's opinion are unsupported by substantial evidence.  Accordingly, the undersigned recommends that the Court find that the ALJ did not err in weighing Dr. Gupta's opinion.

Dr. Dietz

The ALJ considered and weighed the opinions of the state agency reviewing physicians/psychologists, explaining:

> The undersigned further gives great weight to the Disability Determination Services consultants Dr. Teresita Cruz, Dr. David Dietz, and Dr. Stephen Sutherland.  Dr. Cruz and Dr. Sutherland opined that the claimant would be capable of less than light exertional level, with postural limitations and no unprotected heights (3A/9). Dr. Cruz[7] opined that the claimant retains the ability to complete a variety of complex tasks in a stable environment where production standards and schedules are more flexible (3A/11).  Mentally, the claimant's treatment records consistently note that the claimant has good memory, a normal affect, and good judgment. Physically, while knee pain is noted, records show that the claimant consistently had a normal range of motion, had normal reflexes, normal muscle tone, and a normal gait (7F/2-3).

Tr. 90.

Smith argues that the ALJ committed reversible error because he assigned great weight to Dr. Dietz's opinion that Smith retained "the ability to complete a variety of complex tasks in a stable environment where production standards and schedules are more flexible[,]" but did not include the specific restriction in the RFC and failed to explain why the restriction was not included.  Doc. 12, pp. 12-13.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of

---

[7] As noted by the Plaintiff and Defendant, the ALJ mistakenly referred to Dr. Cruz instead of Dr. Dietz when discussing the mental RFC assessment.  Doc. 12, p. 12, n. 1; Doc. 14, p. 10.

record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).   Here, there is no question that the ALJ

considered all the relevant evidence in the record.

Furthermore, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See*

20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).

When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a

physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not

improperly assume the role of a medical expert by assessing the medical and nonmedical

evidence before rendering a residual functional capacity finding." *Id.*  And, "[e]ven where an

ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state

agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency

psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275

(6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8

(N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations

from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision

was not procedurally inadequate nor unsupported by substantial evidence).  Furthermore, an ALJ

is not obligated to explain each and every limitation or restriction adopted or not adopted from a

non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11

(N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

While the ALJ did not include Dr. Dietz's specific limitation in the RFC,[8] as noted

above, the ALJ was not required to.  Additionally, Smith has not shown that the RFC assessment

---

[8] Smith's contention that the VE was questioned regarding Dr. Dietz's <u>specific</u> limitation (Doc. 12, p. 13) is
inaccurate.  Dr. Dietz's limitation addresses the ability to complete a variety of complex tasks.  Tr. 144.  The
question posed to the VE asked about a stable environment with more flexible production standards and schedules,
without noting that the tasks would be complex.  Tr. 122-123.

is unsupported by substantial evidence.   In reaching his decision, the ALJ also considered and weighed the opinion of Dr. Konieczny, the consultative examining psychologist.  Tr. 90.  The ALJ assigned great weight to that opinion, wherein Dr. Konieczny opined that Smith would have no significant limitations in the area of maintaining attention, concentration, and persistence in single and multi-step tasks.   Tr. 90, 533.  Also, when explaining the weight assigned to Dr. Konieczny's opinion, the ALJ indicated that the record generally showed Smith to have appropriate memory and concentration.  Tr. 90.

The undersigned finds that the ALJ properly weighed the medical opinion evidence and, as discussed, an ALJ is not required to adopt a physician's opinion verbatim, even when great weight is assigned.  Accordingly, the undersigned recommends that the Court find no error with the ALJ's failure to include in the RFC assessment Dr. Dietz's opinion that Smith "retains the ability to complete a variety of complex tasks in a stable environment where production standards and schedules are more flexible."

### VII. Conclusion and Recommendation

For the reasons discussed herein, the undersigned finds that the ALJ did not err in weighing the medical opinion evidence.  Accordingly, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

June 20, 2019                                   /s/ Kathleen B. Burke
                                                     _____
                                                     Kathleen B. Burke
                                                     United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the

right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).